**In re CELOTEX CO.**
No. 1080.

District Court, D. Delaware.
Sept. 17, 1935.

Hastings, Stockly & Duffy, of Wilmington, Del., Leonard B. Ettelson, of Chicago, Ill., and T. C. P. Martin (of Satterlee & Canfield), of New York City, for reorganization committee.

Carl W. Painter (of Cravath, deGersdorff, Swaine & Wood), of New York City, and Clarence A. Southerland (of Ward & Gray), of Wilmington, Del., for Central Securities Co.

William G. Mahaffy, of Wilmington, Del., for debtor.

Edward I. Devlin, Jr. (of Blake & Voorhees), of New York City, for debenture holders' committee.

Glen A. Lloyd, of Chicago, Ill., for bondholders' committee.

Richards, Layton & Finger, of Wilmington, Del., and H. C. Lutkin, of Chicago, Ill., for trustees.

Arthur G. Logan (of Marvel, Morford, Ward & Logan), of Wilmington, Del., and Charles A. Riegelman and Walter J. Fried (of Riegelman, Hess & Hirsch), both of New York City, for certain preferred and common stockholders, intervening objectors.

Edwin D. Steel, Jr., of Wilmington, Del., for certain preferred stockholders, intervening objectors.

NIELDS, District Judge.

The Celotex Company has been administered by this court in equity receivership and bankruptcy for over three years. In June, 1934, in the equity receivership proceedings, this court authorized the reorganization committee to promulgate a plan of reorganization dated May 1, 1934, and to solicit for deposit securities and claims against the company and proxies or powers of attorney with respect to its stock. July 2, 1934, after a hearing upon the fairness of the terms and conditions of the issuance of certificates of deposit and receipts under the plan, the court approved such terms and conditions.

February 8, 1935, temporary trustees for the properties of the company were appointed in proceedings in reorganization under section 77B of the Bankruptcy Act (11 USCA § 207). This proceeding superseded the equity receivership. Within thirty days the temporary trustees were made permanent. April 9, 1935, after another hearing upon the fairness of the terms and conditions of the issuance of certificates of deposit and receipts under the plan as modified, the court approved such terms and conditions. July 1, 2, and 3, 1935, a hearing was held in open court upon the fairness and feasibility of the plan of reorganization with amendments and modifications thereof. At this hearing numerous witnesses were heard and extended arguments were made. There was no testimony in opposition to the plan, although some features were objected to by attorneys representing certain preferred and common stockholders. Acceptances of the plan have been filed by the following percentages of security holders, creditors, and stockholders: 79.5 per cent. of the first mortgage bonds; 74 per cent. of the principal amount of unsecured claims including debentures; 68.9 per cent. of the preferred stock; and 53 per cent. of the common stock. Confirmation of the plan is also urged by a bondholders' committee and a debenture holders' committee.

Since 1921 the debtor has been engaged in the manufacture and distribution of building and insulating materials made principally from bagasse—the fiber remaining after the juice has been extracted from sugar cane. Its principal product is Celotex Brand insulating board, a standard building insulating material. Debtor's plant is near New Orleans and occupies a site of approximately 150 acres. Sales offices and distributors are maintained throughout the United States and in the principal foreign countries. In 1922, the first full year of operations, the company manufactured and sold over 18.5 million square feet and thereafter increased its production until 1929 when it produced and sold 322 million square feet. Until 1931 the debtor made steady progress and enjoyed substantial earnings, paying cash dividends on its preferred and common stock of nearly $4,000,000. During 1931 and 1932 the drastic decline in building operations throughout the United States sharply reduced the market for debtor's product. In spite of economies, the company suffered substantial losses in these years aggregating over 1.5 million dollars. On June 26, 1932, receivers were appointed for its properties by this court and ancillary receivers were appointed by the district courts at Chicago and New Orleans.

Since the appointment of the receivers, reorganization of the company has been uppermost in the minds of the receivers and of the old management and particularly of Dahlberg, the organizer and chief executive of the company. The receivers and trustees employed Dahlberg as their representative in managing the operations of the company. Shortly after the appoint-

ment of receivers Dahlberg invited a large number of security holders, stockholders and creditors to a "town meeting" for discussion. At that time a bondholders' committee and a debenture holders' committee was formed. They sent out some literature with requests for the deposit of securities. No other committees were then formed, and nothing was accomplished by any committee. Thereafter Dahlberg visited New York, San Francisco, Los Angeles, Detroit, Pittsburgh, Chicago, New Orleans, Minneapolis, and St. Louis. "I tried" says Dahlberg "to find some plan, and some people who would be willing to and could put new money in at the bottom, and thereby strengthen the structure, instead of putting it in at the top, and thereby weaken the structure." On these visits to the principal financial centers of the country he was unable to obtain such new money. Sharp competition had entered into the company's field. It was necessary to make about $500,000 worth of improvements if the company "was going to hold its own with competition."

In the midst of this hopeless situation, Dahlberg was introduced to Wallace Groves of New York in the late summer of 1933. After months of negotiation a tentative plan of reorganization acceptable to both parties was drafted. Groves offered to furnish the required sum of $500,000. He was the only person found by Dahlberg anywhere in the country who was willing to furnish the necessary money under acceptable terms. Central Securities Corporation (hereinafter referred to as the "subscriber") was formed by Groves as a vehicle for carrying out his undertakings. A reorganization committee was organized. This committee, after consideration of the plan, made some changes in it and proceeded to take the necessary steps to promulgate the plan and procure the required acceptances. Further negotiations were had between the reorganization committee, bondholders' committee and debenture holders' committee. Changes were made in the plan to meet the criticism and suggestions of the different classes of security holders.

Under the modified plan of May 1, 1934, the outstanding securities and claims dealt with are:

1. First mortgage 6½ per cent. sinking fund convertible gold bonds, series A, due December 1, 1939 .......................... $ 821,500.00
   Interest thereon from June 1, 1932 to June 1, 1934............ 106,795.00

2. Ten year 6 per cent. convertible sinking fund gold debentures, due November 1, 1936.......... 1,597,000.00
   Interest thereon from May 1, 1932 to June 1, 1934................. 199,625.00

3. Claims of general creditors...... 155,387.06
   Interest thereon at 6 per cent. from due date, not earlier than May 1, 1932, to June 1, 1934 (estimated) .................... 19,423.46

4. 7 per cent. cumulative preferred stock, par value $100.......... 53,030 shares

5. Common stock without par value and common stock (voting trust certificates) .............. 276,510 shares

6. Warrants for the purchase of common stock (voting trust certificates) .................... 100,000 shares

7. Executory contracts, liabilities and obligations of the company including unexpired leases, etc. ——

The capitalization of a new company, whose securities and stock will be used under the plan to reorganize the debtor, is substantially as follows:

|  | Authorized | Outstanding |
|---|---|---|
| 1. 6½ per cent. first mortgage bonds.. | $ 821,500.00 | $ 821,500.00 |
| 2. 6 per cent. cumulative income debentures ...... | 2,000,000.00 | 1,752,500.00 |
| 3. 5 per cent. cumulative preferred stock ........... | 30,000 shrs. | 29,089 shrs. |
| 4. Common stock.. | 500,000 shrs. | 167,627½ shrs. |

100,000 shares of the new common stock reserved for issuance against the exercise of rights to purchase new common stock.

Under the plan each holder of a $1,000 bond with unpaid interest will receive a new bond for $1,000, one share of preferred stock, and $30 in cash. Each holder of a $1,000 debenture with unpaid interest will receive a new debenture for $1,000 and one share of preferred stock. Each general creditor will receive for the principal of his claim a like principal amount of new debentures, and for each $12.50 of interest one-tenth of a share of new preferred stock. Each holder of two shares of preferred stock will receive one share of new preferred stock and one share of new common stock, and is entitled to subscribe at $6.66 for one share of new common stock. Each holder of three shares of common stock will receive one share of new common stock and is entitled to subscribe for one-half share of that stock at $3.33.

The cash to be provided under the plan is $499,500, to be furnished by subscription of stockholders. Any balance not so furnished will be paid by the subscriber. Under the subscription agreement the subscriber has agreed to pay up to $499,500

in cash to the new company for new common stock at $6.66 per share. The actual amount to be paid by the subscriber will be the difference between $499,500 and the amount subscribed by stockholders. Under the subscription agreement the subscriber has also agreed to advance up to $25,000 for expenses of the reorganization committee. In fact, the subscriber has advanced approximately $87,500.

As the consideration for the undertakings on the part of the subscriber the plan before final amendment provides for the issuance to the subscriber of 15,000 shares of new common stock and of rights to purchase at the price of $10 per share at any time within five years 100,000 shares of new common stock or any part thereof.

At the three-day hearing and the subsequent argument before the court objection was made to that part of the plan providing for the issuance of rights to the subscriber to purchase new common stock at any time within five years. The court regarded these rights as uncertain and speculative in their nature and therefore objectionable. In view of this the parties to the subscription agreement at a subsequent hearing before the court on August 7, 1935, consented that the provision respecting such rights should be eliminated from the plan. As a new consideration for the aforesaid undertakings of the subscriber the reorganization committee submitted to the court at this subsequent meeting new provisions. Under the new provisions the subscriber is to receive 25,000 shares of new common stock outright. The rights of the subscriber to purchase 100,000 shares within five years are eliminated. In lieu thereof, the subscriber is entitled to purchase 50,000 shares of new common stock or any part thereof at $6.66 per share within five days after the expiration of the period within which the stockholders are entitled to subscribe for shares of the new common stock at the same price. Under this last amendment of the plan there will be presently available not less than $499,-500 and not more than $832,500 as working capital for the new company.

The fairness and feasibility of the foregoing plan is challenged by certain stockholders upon the following grounds: (1) That the provisions of the reorganization plan in behalf of preferred stockholders are inadequate; (2) that $500,000 of working capital is unnecessary in view of the cash on hand, and, consequently, that all rights of the subscriber under the subscription agreement should be eliminated; and (3) assuming the additional working capital is necessary, the undertakings of the new company to the subscriber provide excessive compensation.

■ The following considerations answer these objections. The preferred stockholders will receive 26,515 shares of new preferred stock; 26,515 shares of new common stock; and will be entitled to subscribe for 26,515 additional shares of new common stock at $6.66 per share. Stated in other terms, the holder of two shares of preferred stock will be entitled to receive under the plan one share of new preferred stock, one share of new common stock, and the right to subscribe to one additional share of new common stock at $6.66. This provision has received the approval of 68.9 per cent. of the preferred stockholders. If the plan should be disapproved and the property of the debtor liquidated, it is certain that the preferred stockholders would receive nothing. Upon liquidation, the bondholders would certainly be paid in full. They have surrendered their right to payment in full on liquidation for the benefit of stockholders. The first objection to the plan is unsound.

■ The need of at least $500,000 of new working capital is overwhelmingly established. It is essential to rehabilitate credit, modernize equipment to meet present competitive conditions, and to enlarge plants for production on a paying scale. In no other way can stockholders as well as security holders share in earnings. In no other way can the company be reorganized upon a sound basis. This conclusion is supported by the testimony of the trustees, the reorganization committee, and the officers of the company. There is no testimony to the contrary. The second objection is without merit.

■ Three years ago the debtor faced the issue of liquidation or reorganization. Working capital on reasonable terms was not obtainable in any quarter until the subscriber offered to furnish this capital in return for common stock. Obviously the subscriber can enjoy no return on his stock until other security holders are cared for. Thus the credit of saving the debtor from liquidation and of providing the necessary means for reorganization are due to the subscriber. It is noteworthy that even at this time no other person has offered the required amount of working capital upon

better or even equal terms. The gift of 25,000 common shares under the circumstances is fully warranted. The right to subscribe for an additional 50,000 shares of common stock at $6.66 guarantees to the subscriber that measure of authority in the direction of the new corporation that his contribution to the enterprise justly deserves. The record fully establishes that $6.66 per share is full value for this new common stock. The third objection is unsound.

Having disposed of all of these objections, I find the plan of reorganization as modified and amended fair and equitable, and that it does not discriminate unfairly in favor of any class of creditors or stockholders.

█ The plan is also feasible. The annual fixed charges of the debtor, as of the date on which it went into receivership, were as follows:

| | |
|---|---|
| Bond Interest | $ 53,397.50 |
| Debenture Interest | 95,820.00 |
| Bond Sinking Fund | 57,505.00 |
| Debenture Sinking Fund | 100,000.00 |
| Or a total of | $306,722.50 |

As against this, the new company will be required to meet the interest on the new bonds which can never amount to more than $53,397.50. It will only be required to pay interest on the new debentures and to provide sinking fund installments in respect of the new bonds and the new debentures out of earnings. In other words, the annual fixed charges will be reduced from $306,722.50 to $53,397.50—a reduction of about 83 per cent. More cash will be used in operations. It will be necessary to spend more money on the plants, in advertising, and in selling. The additional working capital will render the plan feasible.

June 21, 1935, this court allowed the proofs of claims and proofs of interest filed by creditors and stockholders of the debtor. July 1, 1935, an attorney for certain stockholders made a motion to vacate that order in so far as it allowed the claims filed on behalf of Phœnix Securities Corporation (hereinafter referred to as Phœnix), and prayed for an order limiting them to the actual consideration paid therefor. July 11, 1935, a stipulation was filed in this proceeding showing the extent of the holding of bonds, debentures, and preferred stock by Phœnix and the periods of the purchase thereof. The total consideration paid by Phœnix for such securities by classes was as follows:

| | Principal Amount or Par Value | Purchase Price |
|---|---|---|
| Bonds | $ 44,500.00 | $ 21,731.25 |
| Debentures | 613,000.00 | 188,928.75 |
| Preferred Stock (6,056 shares net) | 605,600.00 | 112,229.75 |
| | $1,263,100.00 | $322,889.75 |

█ Subsection (b) of section 77B of the Bankruptcy Act as amended, 11 USCA § 207 (b) gives this court power under certain conditions to limit claims filed to the actual consideration paid therefor. It was contended that by reason of the relation of Phœnix to the reorganization committee the court should exercise this power. This provision of the bankruptcy act is not applicable to the claims and proofs of interest filed by Phœnix. Unless Phœnix was a duly authorized agent or committee acting on behalf of other creditors of the debtor, the provision relied upon is not applicable. The record shows that Phœnix was not itself the reorganization committee or a member or agent thereof, and that it did not dominate and was not in control of that committee. Further, there is no evidence that Phœnix violated any fiduciary duty towards the security holders of the debtor or took unfair advantage of its position relative to the reorganization in the purchase and sale of securities of the debtor. Accordingly, the motion must be denied.

Upon a review of the entire record, it is apparent that the amendments and modifications of the plan of reorganization approved by the reorganization committee are not materially adverse to the interests of the security holders. On the contrary, such amendments and modifications are clearly in the interest of the security holders. The court will assume that they will accept a plan more beneficial. No advantage would follow a resubmission of the plan to the security holders. The time incident to resubmission would itself entail substantial losses. To be effective, the new working capital should be at once available. A fresh season is at hand, and new opportunities await the reorganized company. Resubmission would be harmful and is unnecessary.

The plan, as modified and amended, will be confirmed.