## In re PRESSED STEEL CAR CO. OF NEW JERSEY.
### No. 18779.

District Court, W. D. Pennsylvania.
July 8, 1936.

Reed, Smith, Shaw & McClay (by Robt. Dodds, of Pittsburgh, Pa.), and William G. Heiner, all of Pittsburgh, Pa., for debtor company.

Thorp, Bostwick, Reed & Armstrong, of Pittsburgh, Pa. (by Earl F. Reed and C. M. Thorp, Jr., both of Pittsburgh, Pa.), for trustees.

Cravath, de Gersdorff, Swaine & Wood, of New York City (by Leonard D. Adkins, of New York City), for reorganization managers.

White & Case, of New York City (by Albert W. Sloan, of Pittsburgh, Pa.), and Rose & Eichenauer, of Pittsburgh, Pa. (by Howard M. Swartz, of Pittsburgh, Pa.), for New York Trust Co.

Sachs & Caplan, of Pittsburgh, Pa. (by Chas. H. Sachs, of Pittsburgh, Pa.), and Hartman, Sheridan, Tekulsky & Pecora and Benjamin A. Hartstein, all of New York City, for committee for protection of preferred stockholders.

Chadbourne, Stanchfield & Levy, C. B. Hughes, Percival E. Jackson, and Tachna & Pinkussohn, all of New York City, for committee for protection of bondholders (Hayden committee).

David M. Palley, of New York City, for Martha Snyder and others.

GIBSON, District Judge.

This is a proceeding for the reorganization of the Pressed Steel Car Company under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). Said company (hereinafter for convenience referred to as the company) was incorporated under the laws of New Jersey in 1899. It is engaged in the manufacture, sale, and repair of freight and passenger cars of all types, and the manufacture and sale of miscellaneous car parts and other materials. Its principal plants, owned directly by the company, are located at McKees Rocks (Pittsburgh), Pa., and at Hegewisch (Chicago), Ill. The company ranks third in the industry in rated capacity of production of freight cars.

The greater part of the assets of the company are represented by property owned directly by the company, and the remainder is represented by securities of subsidiary companies. The principal subsidiary, the Koppel Industrial Car & Equipment Company, is engaged in the business of manufacturing at Koppel (Pittsburgh), Pa., miscellaneous industrial cars and equip-

ment, with a subsidiary in the Philippines engaged in a general merchandise business in equipment and parts. The company also owns the stock of American Steel Corporation of Cuba, which maintains a fabricating plant at Havana and builds cars for railroads in Cuba. Another subsidiary, the Lincoln Gas Coal Company, operates a mine in Washington county, Pa., with a monthly capacity of 40,000 tons of coal. Through subsidiaries, the company also owns certain real property and houses for workmen at the McKees Rocks plant, and subsidiaries own the casting foundries and wheel foundry at this plant.

The company for many years enjoyed a substantial position in the equipment industry, with a record of fluctuating earnings common to this type of business. Consolidated net earnings declined from approximately $1,000,000 in 1930 to deficits of approximately $1,250,000 in 1931 and $1,430,000 in 1932, as shown by the company's books. On January 1, 1933, an outstanding issue of $3,000,000 of 5 per cent. debentures matured. As of that date, the company had outstanding, in addition to the $3,000,000 of maturing debentures, a small issue of $387,500 of debentures of later maturity, approximately $537,000 of additional funded or long-term debt, with approximately $900,000 of guaranteed obligations. It also had outstanding $13,600,-000 par amount of 7 per cent. cumulative preferred stock, on which dividends were in arrears from July 1, 1931, and approximately 411,000 shares of common stock without par value.

Efforts to provide for or refund the $3,000,000 of debentures maturing January 1, 1933, proved unavailing. Certain holders of debentures commenced actions against the company, and subsequently, viz., on May 11, 1933, receivers in equity were appointed by this court. The receivers continued to conduct the business of the estate until June 13, 1934, at which date the company filed a petition for reorganization under section 77B of the Bankruptcy Act, and trustees were appointed for the company and have continued the operation of the business since that time. Under authority of this court, the receivers issued receivers' certificates of indebtedness to provide for certain costs of preservation of the estate and the operation of the business to the extent that cash therefor was necessary. Subsequently, the receivers' certificates were refunded by the issue of 5 per cent. trustees' certificates of indebtedness, of which $2,500,000, principal amount, due January 31, 1937, are now outstanding.

Subsequent to the appointment of the receivers, various committees representing security holders were organized. There are two committees representing holders of debentures, known respectively as the Hayden committee and the Cohen committee; two committees representing preferred stock, known respectively as the Marston committee and the Gilchrist committee; and one committee representing common stock, of which Mr. Arthur Loasby is chairman. The debenture holders' committees called for deposits of debentures, and the record indicates that each received substantial deposits; deposits with the Hayden committee aggregating approximately $1,000,000 of debentures, and deposits with the Cohen committee approximately $300,000. The Gilchrist committee also called for deposits of preferred stock, and received, according to the record, deposits of three or four thousand shares. The other committees did not call for deposits.

In February, 1935, a holder of the company's debentures circularized the security holders of the company with a suggested plan of reorganization involving the refunding of the existing debentures with new mortgage bonds and stock and the raising of necessary new money by subscriptions by stockholders. This plan was never formally proposed in these proceedings or any serious attempt made to secure its acceptance by security holders. In May, 1935, the Cohen committee, representing holders of debentures, filed in court a tentative plan of reorganization which was predicated upon securing a mortgage loan of $2,000,000 from the Reconstruction Finance Corporation. This plan was abandoned as the negotiations with the Reconstruction Finance Corporation proved unsuccessful.

In order to expedite a reorganization, this court fixed June 1, 1935, as the date for the submission of plans of reorganization by creditors and stockholders as contemplated by section 77B of the Bankruptcy Act. As no feasible plan of reorganization was proposed on the date fixed, said date was extended from time to time. In the meantime, efforts were made to interest responsible bankers in the reorganization of the company. Such

bankers included Kuhn, Loeb & Co. of New York City, who had, from time to time, assisted the receivers and trustees in disposing of their certificates. Kuhn, Loeb & Co. associated with them in their consideration of the business the banking firm of J. & W. Seligman & Co. of New York.

On October 14, 1935, the company filed in these proceedings a plan which contemplated that necessary new money would be provided through the sale of first mortgage bonds ranking ahead of the securities given to any existing security holders, but did not assure the underwriting of such first mortgage bonds.

Shortly after the filing of said plan on October 14, 1935, the Gilchrist committee announced to security holders a plan differing in certain respects from the plan proposed by the company, but similarly providing for the raising of new money by the sale of first mortgage bonds. This plan was never proposed by the requisite number of security holders.

Before the plan of October 14, 1935, had been submitted to security holders, the firm of Kuhn, Loeb & Co. received from General American Transportation Corporation a proposal to provide new money to assist in the reorganization of the company by the purchase of first preferred stock of a reorganized company. This proposal was communicated to the company, and, after further negotiations, a modified plan was filed by the company on December 23, 1935, which, as subsequently modified, is discussed hereafter. It contemplated the raising of new money through the purchase of first preferred stock by General American Transportation Corporation and its associates; such associates being Kuhn, Loeb & Co., A. G. Becker & Co., Tri-Continental Corporation, and Selected Industries, Inc. Such purchase was to be made two-thirds for account of General American Transportation Corporation and one-third for account of these associates. This plan as originally filed did not provide for any subscription rights to be given to existing security holders. It contemplated that Kuhn, Loeb & Co. would be reorganization managers thereunder. At about the same time, a joint plan was filed in these proceedings by the Cohen and Gilchrist committees, but such plan was not proposed by the percentage of security holders required under section 77B. This joint plan provided for the raising of new money by the sale of first mortgage bonds.

Upon petition of the trustees for instructions as to the sending out of plans to security holders, a hearing was held on December 23, 1935, the two plans before the court for consideration at that time being the company plan (hereinafter referred to as the "debtor's plan") of December 23, 1935, which involved the issuance of new preferred stock to obtain new money, and the Gilchrist plan, which involved the sale of first mortgage bonds to produce new funds. After hearing, this court filed a memorandum opinion on January 6, 1936, 16 F.Supp. 325, in which it concluded that it would be confusing to security holders to send out both plans at the same time, and directed the debtor's plan to be sent out to security holders. The court indicated that it regarded the debtor's plan, which left the company free from mortgage indebtedness, as more desirable, if approved by the security holders, than the then presented Gilchrist plan, and the court gave tentative approval to the debtor's plan of December 23, 1935, but imposed certain amendments and conditions, the most important of which were (a) that the new money to be raised be increased from $1,500,000, as proposed, to a minimum of $1,750,000, or a maximum of $2,150,000; (b) that the existing stockholders be given the first opportunity to provide this money if they cared to do so; and (c) that if they were unable to provide the whole amount, they be given some participation in the purchase of the new stock with General American and its associates. These modifications were accepted by General American and its associates and by the company, and an amended plan, in compliance with the suggestions of the court, was filed January 16, 1936.

An order was entered on January 21, 1936, as to the manner of submitting the plan to the security holders and prescribing the forms for assent to the plan, and such forms were sent to security holders by the trustees under direction of the court. The plan known as the "Gilchrist plan," urged upon the court at the final hearing, is different entirely from the so-called Gilchrist plan considered by the court in that memorandum opinion. The present Gilchrist plan was submitted after the debtor's plan (as amended January 16, 1936) had been sent out to security holders for their

approval, and it follows generally the provisions of the debtor's plan as modified in accordance with the conditions imposed by the court, except as to the underwriting.

The General American Transportation Corporation was willing to invest its money only if it should have a substantial interest in the company, yet the court was desirous of giving the first opportunity to provide all the funds to the existing stockholders, and so it was necessary to give stockholders two separate options; one known as option I, under which they might, if they so desired, provide the entire funds required and eliminate the General American Transportation Corporation entirely, and, if that failed, a second option known as option II, under which they might have subscription rights to a portion of the new stock on the same basis as General American Transportation Corporation.

The amended debtor's plan, as filed on January 16, 1936, provided, in substance, as follows:

(1) Trustees' certificates and prior claims to be paid in cash or assumed, and certain underlying liens to be assumed.

(2) Holders of debentures and general claims classified with debentures to receive a principal amount of new debentures equal to the principal of the old debentures and claims, and unpaid interest to January 1, 1936, on the old debentures, such new debentures to bear interest at the rate of 5 per cent. per annum (payable only as earned for the first two years), to mature January 1, 1951, and to have a sinking fund based on net earnings as provided in the plan.

(3) Holders of preferred stock to receive for each share three-fifths of a share of new second preferred stock of $50 par value and 1 share of common stock; such second preferred stock to be convertible into common stock at a price of $16⅔ per share.

(4) Holders of common stock to receive per share one-fourth of a share of new common stock.

(5) $2,150,000 par value of 5 per cent. first preferred stock (par value $5 per share) to be offered for subscription to the holders of preferred stock and common stock of the company on the conditions provided in the plan; $1,750,000 par value (350,000 shares) under option I and $400,000 par value (80,000 shares) under option II, such subscription rights to terminate on February 24, 1936; it being provided that if the $1,750,000 par value were so subscribed for under option I, such subscriptions should be accepted and General American and its associates should have no further liability or right under the plan, but if subscriptions under said option I did not equal $1,750,000, then subscriptions under option II would be accepted up to $400,000, par amount, and General American and its associates would purchase $1,750,000 and would have an option to purchase any unsubscribed balance of the $400,000 offered under option II. It was provided that subscribers to stock were required to deposit in cash with the trustees 25% of the amount of their subscription, such deposit to be returned if subscriptions were not accepted.

Subscriptions under option I aggregated only about $565,000, or less than one-third of the new money required, so that such subscriptions were not accepted. Under the plan, option II, therefore, became effective. The subscriptions under option II aggregated about 8,000 shares ($40,000) with the result that General American and its associates became obligated to purchase, subject to the conditions stated in the underwriting agreement attached to the debtor's plan, 350,000 shares of First Preferred Stock at $5 per share, and had an option to purchase, at the same price, the remaining 72,000 additional shares unsubscribed for under option II. General American, although entitled to insist upon the purchase of these shares, waived its right to purchase this balance and the stockholders who had subscribed under option I were given the right to increase their purchases to the extent of this 72,000 shares, with the result that every stockholder of the company who elected, within the prescribed time, to exercise his rights to purchase stock will receive the full amount of the shares for which he subscribed.

At a hearing held on March 5, 1936, the plan was further modified by the debtor (a) to provide that the new debentures should bear fixed interest from the beginning; and (b) to prohibit the retirement of the first preferred stock for three years. It should be stated in passing that it has been subsequently agreed by statements on the record that the indenture under which the new debentures are to be issued will provide that no first preferred stock shall be redeemed or purchased by the new company, so long as any of the debentures re-

main outstanding. As a result of the foregoing modifications, the court, by order entered March 5, 1936, of which due notice was given, provided that acceptance of the plan previously made by stockholders might be revoked at any time prior to March 25, 1936.

Under date of March 4, 1936, the Gilchrist committee proposed another plan which in substance followed the debtor's plan, as amended, except that it provided for the issuance to present security holders of negotiable subscription rights in respect of new preferred stock, gave the present preferred stockholders only common stock, and provided a limited conversion privilege for a period of one year for the new debentures. In the meantime, acceptances of the debtor's plan were being received from security holders and simultaneously the Gilchrist committee was actively soliciting acceptances of its plan, and revocations of acceptances filed to the debtor's plan.

There are over 8,000 stockholders and creditors of the company, much of the stock being held in small lots by scattered stockholders, many of whom had not taken the trouble to have the stock registered in their names, due, no doubt, to the fact that the company had not paid dividends for several years. Although the court had decided to submit only the debtor's plan to the security holders in the first instance, the Gilchrist committee circularized the security holders, asking assents to its plan filed during the voting on the debtor's plan. This probably confused the issue in the minds of some of the security holders. Because of the large number of security holders and the numerous letters issued by various committees, there was difficulty and delay in obtaining the necessary assents. The final hearing upon confirmation of the debtor's plan was adjourned from time to time until June 8, 1936.

The hearing, beginning on June 8, lasted for a period of six days, during which voluminous evidence and exhibits in respect of the plan were produced, and the court inquired into the facts concerning the organization of the various committees and the securities actually represented by them. All parties appearing were given ample opportunity to be heard. At said hearing, the plan was supported by the Hayden committee for debentures, the Marston committee for preferred stock, and the Loasby committee for common stock, and by all other security holders who expressed their views, except the Gilchrist committee for preferred stock, the Cohen committee for debentures, and another representative of debenture holders. As set forth hereinafter, the objections of all but the Gilchrist committee have now been withdrawn.

On May 27, 1936, the court appointed a special master to audit the acceptances of the plan and the revocations of such acceptances and report to the court thereon.

On June 12, 1936, the special master reported that, after a complete audit of all acceptances and revocations, and after full opportunity to all interested parties, including representatives of the Gilchrist committee, to examine the acceptances and revocations and to be heard thereon, he found that the plan had been accepted by holders of 70.576 per cent. of the debentures and claims ranking with debentures, 60.036 per cent. of the preferred stock and 60.994 per cent. of the common stock, being in each case substantially more than the percentages required under section 77B. On June 23, 1936, a supplemental report was filed, covering additional acceptances received subsequent to June 8, 1936, which stated that such additional acceptances, after eliminating certain duplications, had increased the percentages to 76.97 per cent. of debentures and claims, 60.642 per cent. of preferred stock, and 61.516 per cent. of common stock.

Exceptions to the master's report were filed by the Gilchrist committee, and on June 23, 1936, they were heard by the court. At that hearing the special master testified fully as to the procedure followed by him in auditing the acceptances and making his report.

The court has reviewed the testimony of the many witnesses and the arguments of counsel, both oral and as set forth in the briefs filed with the court. All points raised in the proceeding have been considered. Those that require comment are discussed below.

The record shows that the special master has fully complied with the order of his appointment of May 27, 1936, and that he has made a complete, thorough, and detailed examination and audit of the acceptances and revocations filed with the trustees. The principal exceptions and objections to the master's report were as follows:

(a) Acceptances were obtained without adequate disclosure that a competing plan was in the field, and on improper representations that the debtor's plan had been tentatively approved by the court;

(b) Securities of various classes were purchased by certain of the underwriters (General American and certain of its associates) and voted in favor of the plan. The record indicates that the securities so purchased and voted consisted of 5,995 shares of preferred stock and $250,000 principal amount of debentures;

(c) Stock registered in the names of brokerage houses was voted by such brokerage houses without proof being furnished that such brokerage houses had been authorized by their customers to vote such stock;

(d) Certain stock registered in the names of fiduciaries was voted by such fiduciaries without furnishing evidence of their authority so to vote; and

(e) Revocations of acceptances filed after March 25, 1936, were not taken into account by the special master.

The court is satisfied that these exceptions and objections to the master's report have no merit.

■ The court did tentatively approve the plan, reserving, of course, the right to modify or disapprove it later, after full hearing. Because of the complexity of the plan, the large number of small stockholders and the expense of taking a vote on the plan, the court felt that both the proponents of the plan and the security holders were entitled to know, before the plan was circulated for voting, the tentative attitude of the court thereon. This course of action has been approved in certain cases cited in the court's memorandum of January 6, 1936. The proponents of the debtor's plan were entitled, and indeed obligated, to advise security holders of such tentative approval. As to the Gilchrist plan, it is clear that the existence of this plan was fully brought to the attention of security holders, not only through the widespread publicity put out by the Gilchrist committee, but also by the proponents of the debtor's plan, who circulated detailed comparisons of the two plans.

■ An underwriter is not a fiduciary, and there is no principle of law or of equity which prohibits an underwriter of a reorganization plan from purchasing and voting securities dealt with under such plan. In re Celotex Company, Debtor, (U.S.D.C.Del.1935) 12 F. Supp. 1, opinion dated September 17, 1935, by Nields, J.

■ In the instant case, the amounts so purchased and voted by underwriters were relatively immaterial, as compared with the amounts involved in the cases cited, and it is clear that the necessary acceptances were received, even if such votes were not counted.

■ The exception in respect of acceptances signed by brokerage houses for stock registered in their names has no merit. There is no evidence as to what part, if any, of such shares were held by brokers for the account of others. It is clear that the record holder of stock has the right, as between himself and the corporation, to vote the stock, and that objection to such vote can be registered only by the person beneficially interested. This rule is fixed by statute in New Jersey (the state of incorporation of the debtor), General Corporation Act, § 37 (Laws 1896, c. 185, p. 290, § 37; 2 Comp.St.1910, p. 1623, § 37), and has been consistently applied in corporate elections, and no reason appears why a similar rule should not be applied under section 77B. An equitable owner of shares who permits them to stand in his broker's name impliedly authorizes the broker to vote them; any other rule would lead to hopeless confusion. The broker, as registered owner, is entitled to vote the stock registered in his name, General Investment Co. v. American Hide & Leather Co. (1925) 97 N.J.Eq. 214, 127 A. 529. The fact that brokers may be obliged, under the rules of the New York Stock Exchange or under any other requirement of law or regulation, to obtain the consent of their customers before voting the stock does not alter the rule of law in this respect; the presumption being that in the absence of proof to the contrary, of which there was none in this case, consent had been obtained.

■■ The question of the right of a security holder to revoke an acceptance previously given to a reorganization plan proposed under section 77B has not, so far as the court is advised, been passed upon by any court. The order of March 5, 1936, which permitted modifications of the plan, expressly permitted revocations on or before March 25, 1936, of acceptances filed prior to that date, and all such revocations have been given effect by the spe-

cial master. It is also clear, under the orders of this court entered January 21, 1936, and February 10, 1936, that a transferee of a security, the prior record holder of which has accepted the debtor's plan, is entitled, upon presentation of proper evidence that he is the successor holder, to revoke the acceptance filed by his predecessor, and it appears that revocations so filed by transferees duly identified as such have been given effect. Where, however, the revocation was filed after March 25, 1936, by the same person who filed the original acceptance, the court is of the opinion that the rule universally applied in respect to compositions under the Bankruptcy Act should be applicable under section 77B, and that such revocations should not be effective. Myers v. International Trust Company (1927) 273 U.S. 380, 47 S.Ct. 372, 71 L.Ed. 692, 9 A.B.R.(N.S.) 306; In re Jablow, 15 F.(2d) 132 (C.C.A. 2d Cir.); In re Levy, 110 F. 744 (D.C.Pa.).

Otherwise, the holders of a few shares, who had previously voted for a plan could, by threatening revocation of their assents, obtain an undue advantage over others, However, it appears that even if all such revocations were given effect, the plan would still have been accepted by the necessary vote of security holders.

The orders directing the submission of the plan to the security holders recognized the right of a transferee of the shares, during the voting, to record his assent or revoke a prior assent that might have been given by his predecessor in title. Certain provisions of the order enabled the court to require the production in court of a stock certificate or debenture by one asserting the right to vote transferee shares of stock, and also enabled the court to require proof of the authority of a fiduciary to vote shares. The Gilchrist committee, in its exceptions, challenged the vote of all transferee shares, on the theory that the special master did not require such production of certificates or proof. Only transferees of record were permitted to vote; the special master accepting the usual reports of the New York Trust Company, transfer agent of the shares, as his evidence of transferee ownership. It is clear that he was not required to insist upon the actual production of the certificates. Not a single shareholder appeared challenging any vote that may have been given with respect to his shares and no allegation is made that any particular fiduciary was without authority to vote the shares standing in his name; the objection being purely general, without any evidence to support it.

The Gilchrist committee contended that the special master has not eliminated the possibility of duplicate voting by two successive holders or transferees of the same security. It appears that in connection with the debentures all possible duplications have been eliminated by reference to the serial numbers of the debentures which have accepted the plan. It further appears that in connection with the stock, the master, after a thorough examination and check, eliminated all known duplications. The court is satisfied, from the master's report and from the evidence, that the duplications of voting, if any, not already eliminated, are insufficient to affect the result.

The contention in respect of the guaranty on the Lincoln Gas Coal bonds, which is questioned in one of the exceptions to the master's report, to the effect that it is a secured claim, is unsound, for the reason that the security is not on property of the debtor. Bankers' Trust Co. v. Irving Trust Co., 73 F.(2d) 296 (C.C.A. 2d Cir., Nov. 5, 1934). The holders of the guaranteed bonds were therefore entitled to prove for the full amount due on the guaranty, subject only to later accounting in case of excess receipts, as provided in the order approving the claim.

The testimony is uncontradicted that the reorganization managers did not purchase, for their own account, directly or through nominees, any securities of the debtor, and it is therefore unnecessary to pass on the question raised by such of the exceptions as allege on information and belief that certain security owners were nominees of the reorganization managers.

Certain further exceptions of the Gilchrist committee, with respect to requiring proof of ownership of the debentures or stock and the authenticity of signatures, the dating of undated acceptances, the insertion in pencil of the amounts of securities owned by persons filing acceptances with such amounts left blank, and alleged variations from the orders of the court establishing the general method of accepting the plan appear to be entirely without merit. The court is concerned with the substantive fact of acceptance, not the mechanics of registering the assent.

██ Under General Order in Bankruptcy No. 47, as amended (11 U.S.C.A. following section 53), the special master's report is to be deemed presumptively correct, and no evidence contradicting the facts, found by the master, has been produced.

The exceptions to the special master's report are overruled, and the special master's report (as modified by his supplemental report) is adopted and confirmed. The court finds that the debtor's plan has been accepted in writing, as required by the provisions of subdivision (e) clause (1) of section 77B (11 U.S.C.A. § 207 (e) (1), and such acceptances have been filed in the proceeding by or on behalf of creditors holding two-thirds in amount of the claims of each class whose claims have been allowed and would be affected by the plan, and by or on behalf of stockholders of the debtor holding a majority of the stock of each class. The court also finds that the offer of the plan and its acceptance are in good faith and have not been made or procured by any means or promises forbidden by the Bankruptcy Act.

Before proceeding to consider the principal question of the fairness and feasibility of the plan, incidental matters should be disposed of. The plan complies with the provisions of subdivision (b) of section 77B (11 U.S.C.A. § 207 (b). The debtor company is not a utility subject to the jurisdiction of a regulatory commission or commissions or other regulatory authority or authorities, and, accordingly, the provisions of subdivision (e), clause (2) of section 77B (11 U.S.C.A. § 207 (e) (2), are inapplicable. All amounts to be paid by the debtor or by the new corporation, and all amounts to be paid to committees or reorganization managers, whether or not by the debtor or such new corporation, for services or expenses incident to the reorganization, are to be subject to the approval of the court, except that the debtor's plan provides that General American and its associates, as compensation for their underwriting commitment, are to be entitled to receive 30,000 shares of common stock of the new corporation, of which 20,000 shares are to be delivered to Kuhn, Loeb & Co., as compensation for their services as reorganization managers. The court finds that these payments are reasonable.

██ It was asserted, before the plan was submitted to security holders, that the acquisition of stock in the Pressed Steel Car Company by the General American Transportation Corporation might be a violation of section 7 of the Clayton Act (15 U.S.C.A. § 18) prohibiting the acquisition of stock in a competing company, where the effect of such acquisition might be to substantially lessen competition between such corporations. At the time this court filed its memorandum opinion giving tentative approval to the plan, it directed the trustees to give notice to the Department of Justice of this contention, to enable it to present objections, if it saw fit to do so. Such notice was given, and the Department was supplied with facts and figures relating to the business of the two companies. Although the Department did not enter its appearance at the hearing or make objections, the court took testimony on that phase of the matter.

General American is primarily a transportation corporation engaged in the business of owning, operating, and leasing tank cars and certain other types of freight cars and furnishing services (such as tank storage terminals, etc.) incidental to its transportation business. Only a small part of its investments and operations is devoted to the manufacture of freight cars for others; the larger part of the business being the manufacture of tank cars. Except in the case of tank car parts and repairs, it does not manufacture or sell car parts or materials therefor, nor do any substantial freight car repair work for others. Only 4.67 per cent. of the value of its total fixed assets is represented by freight car manufacturing facilities (apart from a small plant devoted exclusively to the manufacture of tank cars), and those facilities are primarily used in building and repairing cars for its own account. During the past five years only 8.21 per cent. of its gross business represented freight car sales to others and 1.59 per cent. represented tank car sales.

On the other hand, the business of Pressed Steel Car Company is primarily the manufacturing and selling of cars of every type and description, passenger as well as freight, and mining and industrial, as well as railway, and does not embrace the ownership, operation, or leasing of cars or the furnishing of any other transportation service. Pressed Steel Car also produces and manufactures all varieties of car parts and materials therefor; tank car parts and repairs being a negligible part of its business. Accordingly, any com-

petition between General American and the new corporation will be in the sale of freight cars, a very small part of the business of General American, and only a portion of the business of Pressed Steel Car. Even in this field, operations of the two companies coincide only to a very limited extent. General American has no car building plant (except for tank cars) east of Chicago, and its freight car sales are largely limited to the market available to plants in the Chicago area. Pressed Steel Car, on the other hand has its main plants at Pittsburgh (its Chicago plant being out of operation for the past four years) so that its freight car sales are largely limited to the market available to plants in the Pittsburgh area. ,

Under these circumstances, it seems to the court that the proposed acquisition by General American of stock in the new corporation is not forbidden by the Clayton Act. As stated by the Supreme Court of the United States in International Shoe Co. v. Federal Trade Commission, 280 U. S. 291, 298, 50 S.Ct. 89, 91, 74 L.Ed. 431: "Mere acquisition by one corporation of the stock of a competitor, even though it result in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree, Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 66 L.Ed. 653; that is to say, to such a degree as will injuriously affect the public."

See, also, Vivaudou, Inc., v. Federal Trade Commission, 54 F.(2d) 273 (C.C.A. 2d, 1931); Pennsylvania R. Co. v. Interstate Commerce Commission, 66 F.(2d) 37 (C.C.A.3d, 1933) affirmed 291 U.S. 651, 54 S.Ct. 559, 78 L.Ed. 1045; Temple Anthracite Coal Co. v. Federal Trade Commission, 51 F.(2d) 656 (C.C.A.3d, 1931); United States v. Republic Steel Corporation, 11 F.Supp. 117 (D.C.N.D.Ohio, E.D. 1935). . .

It is evident from the facts before the court that no such lessening of competition is involved in the instant case.

There is no contention by any one that the debtor's plan is not feasible. It is clear on the record and from the court's knowledge of the business and affairs of the debtor company, obtained through the long period of these proceedings, that the plan sets up a capital structure which should be sound and adequate for the business reasonably to be anticipated, that the new money provided under the plan which is raised by the sale of stock should be sufficient for the normal requirements of the new company, and that, under normal conditions, the capital structure is such as to give the new company adequate credit to provide for occasional extraordinary requirements. Accordingly, the court is satisfied that the plan is feasible.

No substantial contention is made by any one that the plan is not fair and equitable as among the several classes of security holders, or that it discriminates unfairly in favor of any class of creditors or stockholders. The debenture holders receive obligations which will be the sole obligation of the new company (aside from certain small underlying liens) for the full amount of their unpaid principal and interest, and under the offer made by the underwriters receive also a warrant which should be valuable in the event of substantial earnings. The new money, $2,150,000, is provided by the sale at par of first preferred stock junior to the obligations given to the creditors. The entire remaining stock of the new company is given to the preferred stockholders, who come next in line, except that a small amount of common stock is given to common stockholders in recognition of their potential equity in the assets of the company and the earning power which the company has shown in the past. It is impossible to evaluate, mathematically, the exact treatment which must be accorded to common stock in such a situation, but the court is satisfied that the treatment provided by the debtor's plan is fair to both classes, and this view is confirmed by the acceptance of the plan by both classes in substantially equal percentages.

The Gilchrist committee contends that this plan should be disapproved by the court, because the appraised value of the property is substantially in excess of the securities that will be outstanding; the contention being that such value indicates that General American will be receiving too large an equity in the company for its investment.

This contention is based upon appraisal reports filed early in the receivership proceedings. Beginning with a value found by the appraisers as the "going concern" value, and ignoring the liquidating value found by the appraisers, it is possible,

mathematically, to show that there is a considerable equity for common stockholders, and that the portion which General American gets for its investment is too large. There are two persuasive answers to this contention: First, existing stockholders had the first opportunity to provide the necessary funds and were unwilling to do so; and, second, the large majority of the security holders have voted in favor of this plan, evidencing their belief that the equities being given to the corporation and persons providing the new funds are fair and reasonable.

 The Gilchrist committee also objects that one of the points urged upon security holders at the hearing in favor of the debtor's plan, was the opportunity of the new company to avail itself of the management facilities of General American Transportation Corporation, which has been conspicuously successful in its field over a period of several years. It is claimed that there is no definite contract on the part of General American to provide such management. It is reasonable to assume, however, that any company making so large an investment in the new enterprise would assert itself in the management of the company to the extent permitted by its stockholdings. The contention that General American might use its knowledge of the Pressed Steel Car business to further its own business, at the expense of the latter, seems to be sufficiently answered by the fact that the large majority of the security holders of the company, by their assents to the plan, have evidenced their desire for General American management.

The representatives of the debenture holders who originally opposed the plan argued that since the present debentures have a conversion right (although admittedly of little or no value at the present time) and since it appeared from appraisals filed with this court that the liquidating value of the properties of the debtor was more than sufficient to pay the debentures in full, debenture holders should not be forced to accept securities, even for the full face amount of their debt with interest, in lieu of cash, unless debenture holders were protected against the possibility of inflation, and compensated for the risk of consenting to deferred payment, through some conversion right or warrant to subscribe to stock. It is unnecessary to pass upon the merits of these objections, because the underwriters, at the hearing of June 23, 1936, agreed to make available sufficient first preferred stock (approximately 35,000 shares) out of the 350,000 shares which they have agreed to purchase, so that there might be delivered with each $1,000 debentures issued pursuant to the plan a warrant entitling the bearer thereof to purchase 8 shares of first preferred stock at $7.50 per share for a period of six months after the new securities are announced to be ready for delivery, or, to the extent not purchased during such period, at $9 per share during the next six months. On the basis of this offer, all representatives of debenture holders previously opposing the plan have withdrawn their objections. The court is satisfied that the plan is fair as to the creditors affected thereby.

 The debtor's plan now before the court in its final form has the approval of all the committees of bondholders and stockholders, except the Gilchrist committee. A large percentage of the stockholders (approximately one-fourth) have not voted at all, either for or against the plan. Crediting to the Gilchrist committee the full amount of preferred stock which it claims to represent and certain bonds and common stock which it claims to represent, the opposition to the present plan is still a comparatively small minority of each class of security holders. This court could not disapprove of the debtor's plan, having, as it has, such a large percentage of the security holders in its favor, except upon a very persuasive showing of unfairness or discrimination, and none such has been presented.

Accordingly, the court is satisfied that the debtor's plan is fair, equitable, and feasible, and that it does not discriminate unfairly in favor of any class of creditors or stockholders. The proposed certificate of incorporation of the new company which is to acquire the property of the debtor and to issue securities issuable under the plan should be submitted to the court for approval prior to the entry of the formal order confirming the plan. A form of order should be presented in accordance with this opinion.